UNITED STATES of America, Plaintiff–Appellee,

v.

John BOYLE, Defendant–Appellant.

No. 92–3048.

United States Court of Appeals, Seventh Circuit.

Argued May 5, 1993.

Decided Nov. 24, 1993.

Bennett E. Kaplan (argued), Office of the U.S. Atty., Criminal Div., Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Peter Schmiedel, Erica Thompson (argued), Peoples Law Office, Chicago, IL, for defendant-appellant.

\* The Honorable Spencer Williams of the United States District Court for the Northern District of California, sitting by designation.

Before EASTERBROOK and ROVNER, Circuit Judges, and WILLIAMS, Senior District Judge.\*

SPENCER WILLIAMS, Senior District Judge.

In 1992, John Boyle pled nolo contendere to one count of wire fraud, in violation of 18 U.S.C. § 1344, one count of bank embezzlement, in violation of 18 U.S.C. § 656, and eleven counts of making false and fraudulent statements to an agency of the United States, in violation of 18 U.S.C. § 1001. Over Boyle's objections, the district court (1) imposed a sentence enhancement for abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3; (2) denied a reduction in his offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility; and (3) ordered him to pay $2 million in restitution. Boyle appeals these rulings. For the reasons expressed below, we affirm.

## BACKGROUND

Public Armored Car Company ("PAC") operated in Bensenville, Illinois, as a supplier of coin and currency and as a messenger service for various customers. The company collected funds in advance from its customers, in the form of cashier checks, bank account transfers, money orders and currency, which it converted into specific denominations of rolled coin and strapped currency. PAC deposited the coin and currency in its vault coin account at Gladstone Norwood Bank or stored it in a depository at its premises, as directed by its customers.

In March 1987, John Boyle became president of PAC and assumed responsibility for the company's business services. Within a year, the company's net operating loss rose dramatically, from $71,801 to $834,262, due to Boyle's rapid expansion of the business. Boyle was unable to attract investors to finance the large capital expenditures that were necessary for this endeavor.

In June 1988, PAC contracted with the Federal Reserve Bank ("FRB") to store $3

million of FRB-owned coin in its depository and to deliver this coin to FRB customers. PAC was to keep the FRB deposit separate from other funds and was not authorized to use the coin for its own purposes. The contract also required PAC to prepare daily and weekly reports apprising the FRB of the total amount of FRB-owned coin being stored. Boyle signed these reports.

About this same time, PAC entered into contracts with the Illinois Tollway Authority and Cole Taylor/Drovers Bank ("Drovers Bank") to pick up, proof and count all of the fees collected at the Tollway Authority's toll collection booths, to store the coin and currency at PAC's facility, and to credit the receipts to the Tollway Authority's account with Drovers Bank. In addition to performing these functions, PAC transferred Drovers Bank funds, at the bank's direction, to the FRB in order to satisfy reserve requirements for membership in the Federal Reserve banking system. The FRB typically ordered PAC to store this coin on PAC's premises, where it would be available for delivery to other member banks.

Under the contract between PAC and the FRB, the FRB was entitled to conduct "surprise" spot audits of its coin stored at PAC. When conducting one of these audits in December 1988, the FRB discovered that many bags of its coin were missing. Alarmed, the FRB cancelled its contract with PAC, removed its remaining coin from the PAC facility, and conducted a transactional analysis to ascertain the exact amount of its missing funds. That analysis uncovered a shortage of $2,476,175. Drovers Bank also conducted an audit and transactional analysis of its funds held by PAC and discovered that it was missing $1,599,725. PAC's insurance company, Lloyd's of London, paid the FRB and Drovers Bank the respective amounts of their losses.

A government investigation revealed that FRB and Drovers Bank funds had been intermingled and that substantial sums had been misappropriated. The investigation further revealed that Boyle was responsible. On eleven different occasions between October and December of 1988, PAC's president falsely certified and verified in the weekly written reports to the FRB the amount of FRB-owned coin on site at PAC. PAC records also revealed that Boyle transferred one million dollars from PAC's vault coin account to its operating account without providing any explanation. Additionally, there was evidence indicating that he took another one million dollars directly received from coin-buying customers to pay the costs of PAC's operation and expansion. Finally, the government found that Boyle had signed checks and delivery receipts, enabling him to embezzle more than $480,000, which he used to cover his own personal expenses and those of his family and friends.

On appeal, Boyle argues that he did not occupy a position of trust warranting the sentence enhancement under U.S.S.G. § 3B1.3. Secondly, Boyle contends that his offense level should be adjusted downward under U.S.S.G. § 3E1.1 because his plea of nolo contendere constitutes an acceptance of responsibility for the acts charged. Finally, Boyle maintains that the district court ordered him to make restitution without sufficient evidence of the loss and without considering his inability to pay. We address his arguments in turn.

## DISCUSSION

### I. *Abuse of a Position of Trust*

Under U.S.S.G. § 3B1.3, a sentencing court must enhance a defendant's sentence two levels "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense...." Application Note 1 to U.S.S.G. § 3B1.3 further advises: "The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons." U.S.S.G. § 3B1.3 comment. (n. 1). As such, in determining the applicability of this Guideline, the court must determine "(1) whether the defendant occupies a position of trust; and (2) whether the defendant abused his position in a manner that significantly facilitated the commission or concealment of the offense." *United States v. Gould*, 983

F.2d 92, 94 (7th Cir.1993). Boyle contests the district court's determination only as to the first issue, arguing that the relationship he had with his victims was not the type contemplated by § 3B1.3 of the Guidelines. Whether Boyle occupied such a position is a question of fact, which we review under the clearly erroneous standard, while the interpretation of the term "position of trust" is a legal question subject to *de novo* review. *Id.* at 93.

■ Boyle argues that he did not occupy a position of trust because he had a contractual relationship with the FRB, the Illinois Tollway Authority and Drovers Bank. In making this argument, Boyle relies on *United States v. Kosth,* 943 F.2d 798 (7th Cir.1991). In *Kosth,* the defendant opened a merchant account at a bank to process orders from customers using credit cards. The account allowed him to forward credit card invoices to the bank, which would then credit his account and seek reimbursement from the credit card company. Using fraudulent and altered credit cards, Kosth received payment from the bank for phantom purchases. After Kosth pled guilty to conspiracy to commit fraud by access device, the district court found that he had abused a position of private trust and, thus, applied a two-level enhancement under U.S.S.G. § 3B1.3. This Court reversed that determination, reasoning that

> [Kosth's] arrangement with the bank was the same as that of any other merchant— be that a restaurant, shoe store or hotel. There was no special element of private trust involved. Kosth entered into a contract with a bank which enabled him to collect money from the bank upon presentation of a slip of paper indicating that a customer had purchased merchandise with a credit card. As with all credit transactions, there was an element of reliance present. However, the relationship described by the facts in this case was a standard commercial relationship. The fraud described here does not differ from any other commercial credit transaction fraud. The defendant was not an "insider" of the credit card payment system as the government argues. He was an ordinary merchant customer of the bank who committed fraud by abusing his contractual and commercial relationship with it.

*Id.* at 800. Boyle argues that, like Kosth, he had a contractual and commercial relationship with his victims. He also contends that he, too, was not an "insider" of any of his victims and, therefore, no independent trust relationship existed.

We disagree. Whether someone occupies a "position of trust" for purposes of § 3B1.3 does not turn on simple categories that might be used to characterize the relationship. Instead, as this Court recently held, application of the enhancement depends on whether the defendant has "'access or authority over valuable things.'" *United States v. Lamb,* 6 F.3d 415, 421 (7th Cir.1993) (quoting *United States v. Odoms,* 801 F.Supp. 59, 64 (N.D.Ill. 1992)). Therefore, the sentencing court must look beyond descriptive labels to the actual *nature* of the relationship and the responsibility the defendant is given.

Based on these considerations, the district court was correct in concluding that Boyle occupied a position of trust. Unlike Kosth, who was only an account holder at the bank he defrauded, Boyle was an agent of his victims, which entitled him to take possession of funds on their behalf. Boyle was entrusted not only to deliver and store millions of dollars of coin belonging to the FRB and Drovers Bank, he was also entrusted to count it and report how much he was holding on their behalf. With total access to and authority over these funds, Boyle was free to manipulate PAC's records and to falsify the inventory statements he prepared for his customers. It is difficult to imagine a position embodying more trust.

Because Boyle occupied a position of trust and abused that position to embezzle over $4 million, the district court's application of the two-level enhancement under U.S.S.G. § 3B1.3 was appropriate.

## II. *Acceptance of Responsibility*

■ Boyle challenges the district court's refusal to reduce his offense level under U.S.S.G. § 3E1.1 for his acceptance of responsibility. In Boyle's opinion, he was enti-

tled to the reduction because (1) he cooperated with law enforcement officials and the prosecution; and (2) he pled nolo contendere to all thirteen counts of the indictment, saving the government and trial court great expense, in both time and money.

▮ The Sentencing Guidelines provide for a two-level reduction in a defendant's offense level "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. § 3E1.1. It is the defendant's burden to prove his entitlement to this reduction. *United States v. Skinner*, 986 F.2d 1091, 1100 (7th Cir.1993).

▮ Whether a defendant accepted responsibility for his criminal conduct is a question of fact, which this court reviews for clear error. 18 U.S.C. § 3742(e); *Skinner*, 986 F.2d at 1100. Under this standard of review, an appellate court is not to disturb a finding of fact unless, after reviewing all the evidence, it "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

The district court's finding as to Boyle's acceptance of responsibility was not clearly erroneous. After reviewing the evidence and circumstances surrounding the plea, the district court concluded at Boyle's sentencing hearing that Boyle had not clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. There is no indication whatsoever in the record that Boyle admitted any involvement in the offenses charged or that he volunteered in any way to assist the authorities in the recovery the missing funds. *See* Application Note 1, U.S.S.G. § 3E1.1. In fact, he refused to be interviewed in depth about the scheme, which the district court noted when overruling Boyle's objection to the Presentence Investigation Report. Tr. 41. Rather than take some action which might have been interpreted as an acceptance of responsibility, Boyle did just the opposite.

We also reject Boyle's argument that he was entitled to the reduction because his nolo contendere plea saved the government and district court the time and expense of a long and complicated trial. Although the Guideline encourages judicial and law enforcement economy, that is not its only purpose. It also recognizes the societal interest in crime reduction, restitution, rehabilitation, early withdrawal from criminal activity and withdrawal of criminals from positions of trust and responsibility. *United States v. Henry*, 883 F.2d 1010, 1011–1012 (11th Cir.1989) (quoting *United States v. Belgard*, 694 F.Supp. 1488, 1497 (D.Or.1988), *aff'd*, 895 F.2d 615 (9th Cir.1990), *cert. denied*, 498 U.S. 959, 111 S.Ct. 389, 112 L.Ed.2d 399 (1990)). To adopt the rule that Boyle suggests would ignore these other purposes and emasculate the Guideline. This we refuse to do.

Therefore, the district court's rejection of a two-level reduction in Boyle's offense level based on his failure to accept responsibility was not clearly erroneous.

### III. *Restitution*

Boyle also appeals the district court's order requiring him to pay $2 million in restitution to PAC's insurer, which paid the FRB and Drovers Bank the total amount of their losses. According to Boyle, the district court erred in requiring him to make restitution and in setting the amount of restitution.

▮ The district court's decision to order restitution and the amount ordered is reviewed for abuse of discretion. *United States v. Arvanitis*, 902 F.2d 489, 496 (7th Cir.1990). A restitution order will not be disturbed on appeal unless the sentencing judge exercised his or her discretion using inappropriate factors or unreliable information or failed to exercise any discretion at all in issuing the order. *United States v. Mahoney*, 859 F.2d 47, 49 (7th Cir.1988).

▮ When determining whether to order restitution and the amount to award, the trial court must consider the following factors: (1) the amount of the loss sustained by the victim as a result of the offense; (2) the financial resources of the defendant; (3) the financial needs of the defendant and the defendant's dependents; (4) the financial earning ability of the defendant and the defendant's

dependents; and (5) any other factors the court deems appropriate. 18 U.S.C. § 3664(a). The sentencing judge need not explicitly express reliance upon each of these mandatory factors, although it is always advisable to do so. *United States v. Gomer*, 764 F.2d 1221, 1223 (7th Cir.1985).

■ Boyle attacks the restitution order on several grounds. First, he contends that the evidence was insufficient as to how much of the missing funds were attributable to his conduct. In this regard, he claims that (1) the testimony on which the district court relied lacked an adequate foundation; (2) there was no evidence to establish that Lloyd's of London had an obligation to pay the FRB and Drovers Bank for their losses; and (3) the government failed to show that the money was not stolen by others who had access to it.

The government has the burden of establishing by a preponderance of the evidence the amount of the loss sustained by the victims of a defendant's criminal conduct. 18 U.S.C. § 3664(d). At Boyle's sentencing hearing, F.B.I. Special Agent William Keefe testified that the FRB conducted an audit and determined that $2,476,175 of its deposit was missing. Tr. 65. Keefe also testified that Drovers Bank conducted an audit and determined that $1,599,725 in coin was not in storage at PAC as it should have been. Tr. 68. Keefe not only knew the amount of the missing funds but also how the audits were performed. Tr. 61, 64–65, 69–70. Boyle complains that Keefe's testimony lacked an adequate foundation because he could not identify who conducted the Drovers Bank audit or the accounting method that was used. However, we cannot conclude that Keefe's testimony should have been given no weight because he was unfamiliar with these details. Given the matters to which Keefe was able to testify, it was well within the district judge's discretion to conclude that the losses sustained totalled $4,075,900.

Nor did the district court abuse its discretion in concluding that Lloyd's of London had a contractual relationship with PAC which required the insurer to pay out on the FRB and Drovers Bank losses. Although the government did not produce the Lloyd's of Lon-

don insurance policy, Keefe testified that the company paid the FRB and Drovers Bank the total amount of their losses after making its own independent investigation. Tr. 68–69. This testimony provided a sufficient basis for the district court to conclude that Lloyd's of London had a contract with PAC and performed its obligations under that contract.

We also reject Boyle's argument that the government was required to prove that the money was not stolen by others who had access to it. Title 18 U.S.C. § 3664(d) only requires the government to show that it was more likely than not that Boyle's conduct caused the victims' loss. Thus, the government need not disprove all other theories that might account for the loss.

■ Boyle also attacks the restitution order on the ground that the district court failed to consider his financial resources and ability to pay. According to Boyle, it is obvious from the record that he will never be able to make the $2 million in restitution the district court ordered.

The defendant bears the burden of establishing by a preponderance of the evidence his current and potential financial resources. 18 U.S.C. § 3664(d). When Boyle objected to the Presentence Investigation Report, he indicated that he has a high school education, a negative net worth of $10,715, and a positive cash flow of only $250 per month. Tr. 26, 130. He also notes that the district court appointed counsel for him based on his indigent status and declined to impose a fine because of his inability to pay it. Boyle further argues that there is no hope of his ever being able to comply with the restitution order since PAC is no longer in business and he is legally foreclosed from securing employment in law enforcement or the armored car business, the only two fields in which he has experience.

■ Despite Boyle's contentions, the record demonstrates that the district court gave proper attention to his financial status and earning capacity in its restitution order. The district court expressly stated that it considered Boyle's available financial resources and his financial needs in fashioning its order.

Tr. 165. Although 18 U.S.C. § 3664(a) requires the sentencing judge to take the defendant's indigence into account, it is not determinative of whether restitution is appropriate. *See United States v. House,* 808 F.2d 508, 510 (7th Cir.1986). The court also stated that it considered Boyle's future earning capacity in light of the custodial sentence and probation period it was imposing as well as the factors that Boyle argues would limit his ability to comply with the restitution order. Tr. 148, 165. However, the court permissibly concluded that Boyle's "great zeal" in operating businesses and engaging in substantial financial transactions would enable him to one day earn a significant income. Tr. 148. It was also permissible for the district court to conclude that Boyle still had access to $1.7 million of the missing money. Evidence indicated that he had pocketed over $480,000 of the missing funds and another $1,250,000 remained unaccounted for. The court also noted that the funds were taken over a short period of time and there was little time in which to spend them. Tr. 165.

The record demonstrates that the district court considered all of the mandatory factors, pursuant to 18 U.S.C. § 3664(a), when ordering Boyle to make restitution. In its assessment of Boyle's current and future financial condition, the district court appropriately considered the likelihood that he had access to the missing funds. Where there is evidence that a defendant's criminal conduct caused the loss and the missing funds cannot be accounted for, the district court may reasonably infer that the defendant knows their whereabouts. In such cases, it is appropriate for the sentencing judge to fashion a restitution order that prevents the defendant from reaping any gain from his criminal activities after being released.

Finally, Boyle argues that the restitution order should be vacated because the amount was not accurately computed. Boyle bases this argument on the fact that the district court ordered him to pay $2 million in restitution even though it found that Boyle secreted only $1.7 million. The restitution amount must be ascertained and delineated with an accurate computation, cannot exceed the loss actually caused, and

must be clearly set out with specific findings. *United States v. Lovett,* 811 F.2d 979, 990 (7th Cir.1987). In this case, the district court ordered Boyle to make restitution in an amount less than the actual loss. The court supported this determination with findings as to Boyle's current financial status, his future earning capacity and his access to a portion of the missing funds. The restitution amount is also reasonable in light of these findings. In determining the restitution amount, a sentencing judge is limited only by the actual loss as well as the other mandatory factors enumerated in 18 U.S.C. § 3664(a), not the amount that the defendant may have squirreled away. Since the district court complied with all of these requirements, it did not abuse its discretion in computing the restitution amount.

**AFFIRMED.**