123 F.3d 472
 Unempl.Ins.Rep. (CCH) P 22,190
UNITED STATES of America, Plaintiff-Appellee/Cross-Appellant,
v.
Sergio ZARAGOZA, a/k/a Louis A. Valera,
Defendant-Appellant/Cross-Appellee.
and
UNITED STATES of America, Plaintiff-Appellee,
v.
Alicia ZARAGOZA-BARAJAS, Defendant-Appellant.
 Nos. 96-3353, 96-3629 and 96-3371.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 16, 1997.
Decided July 28, 1997.
 
 Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Daniel Howard Parish (argued), Office of the United States Attorney, Chicago, IL, for Plaintiff-Appellee.
 Howard B. Levy (argued), Chicago, IL, for Louis A. Valera.
 Robert L. Rascia, Michael Monaco (argued), Serpico, Novelle & Navigato, Chicago, IL, for Alicia Zaragoza-Barajas.
 Before CUMMINGS, FLAUM, and RIPPLE, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 Defendants were charged with mail fraud (18 U.S.C. §§ 1341, 1342) in a multicount superseding indictment. Defendant Zaragoza, without a written plea agreement, pleaded guilty to seventeen counts of mail fraud and one count of use of a fictitious name in the commission of mail fraud, and was sentenced under the federal Sentencing Guidelines to forty-one months' imprisonment, followed by three years of supervised release, restitution in the amount of $569,741, and a $900 special assessment. Pursuant to a written agreement with the government, defendant Zaragoza-Barajas ("Barajas") pleaded guilty to one count of use of a fictitious name in the commission of mail fraud and was sentenced under the Guidelines to thirty-three months' imprisonment, followed by three years' supervised release, restitution in the amount of $569,741, and a $50 special assessment. Both defendants appeal their sentences. The government cross-appeals the district court's failure to impose an obstruction of justice enhancement to Zaragoza's offense level. For the following reasons, we affirm as to all sentencing issues raised by defendants; further, because an obstruction enhancement is warranted in Zaragoza's case, we vacate his sentence and remand his case for resentencing.
 
 BACKGROUND
 
 2
 For approximately six years, the defendants engaged in an extensive scheme by which they defrauded the Illinois Department of Employment Security ("IDES") by fraudulently procuring unemployment compensation checks for fictitious employees. Zaragoza and his brother Jose owned, respectively, El Saloon Bar and La Palapa Restaurant, both of which are located in Chicago.[1] Each quarter, Zaragoza and his brother submitted to IDES fraudulent forms (known as UC3/40 forms) in which they listed fictitious employees of these two establishments. Sometime thereafter, Zaragoza, Jose Zaragoza, and other participants in the scheme including Barajas (Sergio and Jose's sister), Mayra Zaragoza (Jose's wife), and Cesar Zaragoza (Jose's nephew) filed applications for unemployment benefits under the names of these fictitious employees--using as addresses for the fictitious persons various addresses under their control such as El Saloon's address, Barajas' home address, and Zaragoza's address. In turn, IDES would send a form (BIS-032) to El Saloon and La Palapa to verify the purported employees' unemployment status and to give the employer an opportunity to contest or otherwise respond to the claim for benefits. Zaragoza and his brother Jose would respond (on behalf of El Saloon and La Palapa, respectively) by confirming and supporting the fraudulent claims. IDES then approved the claims and issued benefit checks. The scheme participants forged endorsements on the checks and then cashed or deposited the checks into bank accounts they controlled. At the time of the sentencing hearing, several of the participants were fugitives and the proceeds from the scheme were virtually unaccounted for.
 
 
 3
 The government's investigation revealed that of the 138 names under which claims (established to be fraudulent) were submitted, 55 were the names of persons who had applied for loans through Nationwide Acceptance Corp., where Barajas was employed as a branch manager.[2] The use of information obtained through Nationwide caused at least seven people who subsequently filed valid unemployment claims to suffer delays and other difficulties in securing benefits. No other scheme participant was ever employed at Nationwide.
 
 
 4
 In determining Zaragoza's sentence, the district court found that the amount of loss attributable to him was $569,741. Accordingly, pursuant to U.S.S.G. § 2F1.1(b)(1), the district court increased his base offense level ten levels. The district court also determined that his offense level should be increased four levels for his role as an organizer or leader of criminal activity involving five or more participants. U.S.S.G. § 3B1.1(a). The district court concluded that Zaragoza did not qualify for a two-level reduction in his offense level for acceptance of responsibility. U.S.S.G. § 3E1.1(a). Finally, ruling against the government, the district court refused to impose a two-level obstruction of justice enhancement for his attempts to disguise his writing. See U.S.S.G. § 3C1.1. On appeal, Zaragoza maintains that the district court erred in finding that the amount of loss attributable to him was $569,741, in ordering restitution in that amount, in denying him an acceptance of responsibility reduction, and in imposing an aggravating role enhancement without supporting its finding with specific evidence. The government's cross-appeal contends that the district court erred by failing to impose an obstruction of justice enhancement.
 
 
 5
 As with Zaragoza, the district court also attributed $569,741 in losses from the scheme to Barajas and ordered her to pay restitution in that amount. Adopting Zaragoza's arguments, Barajas challenges both the calculation of loss attributable to her and the restitution order. The district court imposed a two-level increase in Barajas' offense level for abusing a position of trust in the commission of her offense, U.S.S.G. § 3B1.3, and denied her a two-level reduction for acceptance of responsibility. She challenges both of these determinations.
 
 ANALYSIS
 
 6
 We begin by addressing the issues common to both defendants' appeals: calculation of the amount of loss, propriety of the restitution orders, and the district court's denial of offense-level reductions for acceptance of responsibility. Thereafter, the defendants' individual contentions and the government's cross-appeal will be taken up.
 
 COMMON ISSUES
 Amount of Loss
 
 7
 Zaragoza and Barajas both contend that the district court erred in determining that the amount of loss attributable to each was $569,741. Our review of the district court's factual finding regarding the amount of loss attributable to a defendant is for clear error only. United States v. Jackson, 95 F.3d 500, 505 (7th Cir.1996), certiorari denied, --- U.S. ----, 117 S.Ct. 532, 136 L.Ed.2d 417; United States v. Morris, 80 F.3d 1151, 1171 (7th Cir.1996), certiorari denied, --- U.S. ----, 117 S.Ct. 181, 136 L.Ed.2d 120.
 
 
 8
 In its efforts toward establishing the amount of loss resulting from defendants' scheme, the government investigated all IDES claims in which El Saloon, La Palapa, or Landscape Maintenance[3] had been identified as the claimant's employer. The government verified the falsity of each such individual claim by one or more of three methods: (1) interviewing the actual persons in whose names the claims had been submitted; (2) reviewing the records of the claimants' actual employers; or (3) confirming through Social Security Administration records that the IDES claims contained erroneous biographical information such as date of birth or social security number. Only where one or more of these methods revealed a false claim, and where records indicated that IDES had sent a benefits check to an address controlled by the defendants or their co-schemers and the check had been deposited into bank accounts controlled by them, were the amounts disbursed to the putative claimant included in the government's loss calculation. Having reviewed the government's submissions relating to the amount of loss, the district court concluded:
 
 
 9
 I am persuaded not only by a preponderance of the evidence but beyond a reasonable doubt that the loss figures are as the government says. I think the loss is $569,741 here. And I think there was a deliberate and conservative calculation in reaching that amount.... It is true that not all of the losses could be proved to have been fraudulent in the same analytical way. There are a variety of methods used to determine where the loss is. And some were lacking, as I think has been pointed out here. But there is not any question that every loss figure that finds its way into this total of 569,000 was proved in at least one compelling way or another, and most in more than one way.
 
 
 10
 Sentencing Transcript at 30-31.
 
 
 11
 In challenging the district court's loss finding, defendants simply and conclusorily assert that "verification of the amount of loss other than by verification with the actual person or actual employer lacks the sufficient degree of reliability to support its probable accuracy" and "verification of the amount of loss through the Social Security Administration does not support the preponderance of the evidence standard due to its lack of reliability." Conspicuously absent from defendants' argument is any explanation of why verification via the Social Security Administration's records should be deemed unreliable. And even if verification through Social Security Administration records might, as a general matter, be unreliable for some unexplained reason, defendants utterly fail to address why that verification should be considered unreliable in the instant case where it was corroborated by the facts that the putative claimants identified El Saloon and La Palapa as their employers, used addresses controlled by the defendants or other participants in the scheme, and deposited the IDES checks into bank accounts controlled by the defendants or other participants. In the absence of any showing whatsoever by defendants as to the unreliability of the government's loss evidence and absent any explanation for assailing these additional corroborating circumstances, the district court properly concluded the government had proved the amount of loss by a preponderance of the evidence.
 
 
 12
 Maintaining that she was not a primary player in the scheme, Barajas contends that the district court erred in attributing the entire $569,741 loss to her. In this regard she notes that there were a number of participants in the scheme and she could not reasonably foresee the full extent of loss caused by the scheme. Additionally, she notes that only 61 of the 138 names and identities used in the scheme were directly traced to her. Based on the government's showing that Barajas not only was a source of names for the scheme but also provided her residence as a mailing address for the scheme, forged documents, and appeared in person at IDES offices pretending to be a claimant in the service of the scheme, the district court rejected her "lesser role" argument and concluded that her role was "absolutely integral and essential to this scheme." We can discern no clear error in this finding. The district court simply found Barajas' attempts to explain away these other indicia of her involvement to be incredible, commenting at times that her explanations "just [did] not make any sense," were "absurd," and "[flew] in the face of reality." We have found nothing in the district court record nor in Barajas' submissions to this Court that lends any credence to her efforts to distance herself from the goings-on of the scheme. Hence there was no clear error in the district court's finding concerning her central role in the offense.
 
 
 13
 Having determined that Barajas played an "absolutely integral and essential" role in the scheme, the district court found that the entire $569,741 loss was objectively foreseeable to her. Here again there was no error. Under the Sentencing Guidelines, "all reasonably foreseeable acts and omissions of others in furtherance of ... jointly undertaken criminal activity" are to be considered in determining Barajas' offense level. U.S.S.G. § 1B1.3(a)(1)(B). While Barajas argues that there was no evidence that she was aware of any IDES claims other than those for which she provided the names and biographical information, her argument misapprehends the nature of foreseeability as used in this context. Our cases make clear that "[r]easonable foreseeability refers to the scope of the agreement that [a defendant] entered into when he [or she] joined the conspiracy," United States v. Flores, 5 F.3d 1070, 1083 (7th Cir.1993), certiorari denied, 510 U.S. 1074, 114 S.Ct. 884, 127 L.Ed.2d 79, not actual knowledge of specific transactions in furtherance of the conspiracy. See, e.g., United States v. Akindele, 84 F.3d 948, 959 (7th Cir.1996) ("The Guidelines do not require that [defendant] have been aware of the particulars of each and every action committed by [his co-schemer]. So long as [the co-schemer's] actions were reasonably foreseeable and in furtherance of the jointly undertaken criminal activity, [defendant] is as accountable as [the co-schemer] himself."); United States v. Catalfo, 64 F.3d 1070, 1083 (7th Cir.1995), certiorari denied, --- U.S. ----, 116 S.Ct. 1683, 134 L.Ed.2d 784; United States v. Flores, supra. Here, the district court's determination that Barajas was centrally involved in the scheme--providing the scheme with names and biographical information for fictitious claimants, using her address as a mailing address for the IDES benefits checks, forging IDES documents, and making personal appearances at IDES offices pretending to be a claimant--amply supports the conclusion that the entire loss due to the scheme was reasonably foreseeable to her. The record fully supports the inference that Barajas worked hand-in-hand with the other participants at virtually every phase of the scheme; and, while she might not have known the particulars of each and every fraudulent claim that was submitted to IDES, there can be little doubt that she was fully aware of the scope of the scheme from the outset of her participation. Accordingly, her challenge to the district court's determination that she is accountable for the entire loss is without merit.
 
 Restitution
 
 14
 Zaragoza and Barajas both contend that the district court erred in ordering restitution in the amount of $569,741 because the court ignored its obligation to consider all the factors identified in 18 U.S.C. § 3664(a).[4] In particular, defendants maintain that it was not improbable that the district court failed to consider their financial status and ability to earn enough money to make restitution. "A defendant claiming that the district judge failed to consider a mandatory sentencing factor must show either that (1) it is not improbable that the judge failed to consider the mandatory factor and was influenced thereby, or (2) the judge explicitly repudiated the mandatory factor." United States v. Murphy, 28 F.3d 38, 41 (7th Cir.1994).
 
 
 15
 The decision to order restitution rests in the sound discretion of the district court. Accordingly, a district court's decision to impose restitution is ordinarily reviewed for abuse of discretion. Id. at 40. Here, however, we review only for plain error because neither defendant objected to the restitution order in the district court. United States v. Jaroszenko, 92 F.3d 486, 492 (7th Cir.1996). "An error is plain when it is conspicuous and when it probably changed the outcome of the court's decision-making regarding the restitution order." Id.
 
 
 16
 The district court's justification for ordering Zaragoza and Barajas to pay restitution was that, although neither of these defendants appeared to have the present ability to pay restitution, the fact remained that the government was unable to account for the majority of the scheme's proceeds and there was a "reasonable possibility that some of this large amount of money is still around there someplace and [defendants have] control of it. And if that is true--and there is no reason to think it is not true--it would be an injustice to let [them] keep it." Sentencing Transcript at 65.
 
 
 17
 In basing the restitution order on its conclusion that Zaragoza and Barajas may still have access to the ill-gotten gains of their scheme, the district court was on solid ground and well within the standards for imposing restitution applied by this Court. For example, in United States v. Boyle, 10 F.3d 485 (7th Cir.1993), a panel of this Court explained:
 
 
 18
 In its assessment of Boyle's current and future financial condition, the district court appropriately considered the likelihood that he had access to the missing funds. Where there is evidence that a defendant's criminal conduct caused the loss and the missing funds cannot be accounted for, the district court may reasonably infer that the defendant knows their whereabouts. In such cases, it is appropriate for the sentencing judge to fashion a restitution order that prevents the defendant from reaping any gain from his criminal activities after being released.
 
 
 19
 Id. at 492. Similarly, in United States v. Lampien, 89 F.3d 1316, 1325 (7th Cir.1996), the panel observed, "if Lampien is unable to prove to the satisfaction of the district judge that she no longer possesses any part of the nearly one-half million dollars she embezzled, the judge may, in his discretion, consider the resulting amount as being available for purposes of restitution." Moreover, this Circuit is certainly not alone in finding unaccounted-for proceeds from criminal activity to be appropriate grist for the restitution mill. See, e.g., United States v. Olson, 104 F.3d 1234 (10th Cir.1997) ("we hold that when a defendant has secreted proceeds from an illegal activity, the illegal proceeds are presumed assets of the defendant unless the defendant proves otherwise"); United States v. Voigt, 89 F.3d 1050, 1092 (3d Cir.1996) ("[We] place the burden of proof on the defendant to show what has happened to all of the illegally obtained assets. All assets for which the defendant cannot account may be included in the amount of restitution ordered. To the extent that records are unavailable, the risk of inaccuracy should be borne by the defendant rather than the victims."), certiorari denied, --- U.S. ----, 117 S.Ct. 623, 136 L.Ed.2d 546.
 
 
 20
 The district judge's remarks concerning the restitution order were not extensive;[5] nevertheless, we can find no plain error in the order. He expressly relied on an appropriate consideration, and we are unpersuaded by defendants' contentions that the outcome would have been any different had the district judge expressly discussed his evaluation of their financial needs and resources and ability to pay. In short, the district judge's finding that it was reasonably probable that these defendants had access to and control over the missing proceeds effectively counters their assertions that they are without the ability to pay and that the restitution order is impossible to fulfill. As this Court's decisions make clear, full restitution is the norm and the defendants bear the burden of establishing that they are without the resources to pay or that there is no hope of complying with the restitution order. United States v. Wilson, 98 F.3d 281, 284-285 (7th Cir.1996) (affirming order of approximately $3 million in restitution despite defendant's claim of indigence and no prospect of complying). They have failed to meet that burden.[6]
 
 Acceptance of Responsibility
 
 21
 Both Zaragoza and Barajas maintain that the district court erred by denying them an offense-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), which provides: "If the defendant clearly demonstrates acceptance of responsibility for his [or her] offense, decrease the offense level by 2 levels."[7] It is the defendant's burden to prove by a preponderance of the evidence that he or she is entitled to an acceptance of responsibility reduction. United States v. Purchess, 107 F.3d 1261, 1266 (7th Cir.1997); United States v. Akindele, 84 F.3d 948, 956 (7th Cir.1996). Although entry of a guilty plea prior to trial (combined with truthful admission of the conduct comprising the offense of conviction) constitutes "significant evidence of acceptance of responsibility," U.S.S.G. § 3E1.1, Application Note 3, that evidence may be outweighed by conduct that is inconsistent with acceptance of responsibility. Id. Such conduct includes "falsely den[ying] or frivolously contest[ing] relevant conduct that the court determines to be true." Id., Application Note 1(a). The Sentencing Guidelines specifically note that, "[a] defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." Id., Application Note 3. This Court has directed sentencing courts to "look beyond formalistic expressions of culpability and ... determine whether the defendant has manifested an acceptance of responsibility for his offense in a moral sense." United States v. Hammick, 36 F.3d 594, 600 (7th Cir.1994); see also United States v. Dvorak, 41 F.3d 1215, 1217 (7th Cir.1994) ("What the sentencing judge is to look for is a defendant's demonstration of 'genuine remorse,' or 'conscience.' ") (quoting United States v. Beserra, 967 F.2d 254, 256 (7th Cir.1992), certiorari denied, 506 U.S. 957, 113 S.Ct. 419, 121 L.Ed.2d 341). The district court's determination as to acceptance of responsibility is highly fact specific and involves the district judge's subjective appraisal of the totality of the defendant's conduct. See, e.g., Dvorak, 41 F.3d at 1217; United States v. Rosalez-Cortez, 19 F.3d 1210, 1218 (7th Cir.1994) ("The sentencing judge, having a unique vantage point from which to survey and evaluate a defendant's acceptance of responsibility, must be given great latitude and deference when making that subjective decision."). Accordingly, we review a district court's acceptance of responsibility finding for clear error.
 
 
 22
 Among the factors a district court may appropriately consider in determining whether a defendant qualifies for an acceptance of responsibility reduction is whether the defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admitt[ed] or not falsely den[ied] any additional relevant conduct for which defendant is accountable for." U.S.S.G. § 3E1.1, Application Note 1(a). In denying Zaragoza's reduction, Judge Kocoras stated:
 
 
 23
 [H]ere is the point on the acceptance of responsibility.... It is true that the central reason for the government opposing the acceptance reduction and [the probation officer's] adoption of that position, is that he has not accepted the government's facts, figures and premises. That is true.
 
 
 24
 But the reason that I do not think he is entitled to an acceptance [reduction] is because I think the government's facts and figures are compelling.... [I]t is not as if he is not accepting some hypothetical theory that is floating in the air. I think these numbers and the general character and the dimensions of this scheme are very, very well-established.
 
 
 25
 * * *
 
 
 26
 So, what this really computes to is that Mr. Zaragoza has not accepted not only a government hypothesis, but a well-documented position based on objective evidence and compelling conclusions. And, so he has not accepted full responsibility, as the evidence suggests he has a responsibility for. And it is for that reason that I would not give him the acceptance.
 
 
 27
 Sentencing Transcript at 34-35.
 
 
 28
 In light of the applicable standards of review and the district court's express findings that Zaragoza persisted in denying relevant conduct that had been well established by the government, his appeal of the district court's denial of an acceptance reduction borders on the frivolous. Perhaps the most glaring illustration of Zaragoza's failure to accept full responsibility for his offense is to be found in his persistent denial that he is the Louis A. Valera who devised and directed this scheme, despite compelling evidence to the contrary.[8] (We address this issue in detail below, where we take up Zaragoza's challenge to his enhancement for being a leader or organizer of this scheme.) This Court has, on many occasions, affirmed the denial of an acceptance reduction where the defendant has denied or attempted to minimize his or her role in the offense. See, e.g., United States v. Jones, 52 F.3d 697, 701 (7th Cir.1995) (affirming the denial of an acceptance reduction where defendant "had not fully admitted the extent of her participation in the scheme"); United States v. Linnear, 40 F.3d 215, 222 (7th Cir.1994) (finding no acceptance of responsibility where defendant had denied, inter alia, that he had a supervising role in the criminal organization); United States v. Garcia, 35 F.3d 1125, 1133 (7th Cir.1994) (challenge to denial of acceptance reduction was "groundless" where defendant was "less than truthful about his role in the offense"). Not only did Zaragoza deny or minimize his role in the scheme, he also minimized the amount of loss caused by the scheme (which the district court found to be thoroughly investigated and well established), without any real basis for challenging the government's figures. Application Note 1 to § 3E1.1 makes clear that the false denial or frivolous contesting of relevant conduct is inconsistent with acceptance of responsibility. That is precisely what Zaragoza has done here. Thus the district court's refusal to grant Zaragoza an acceptance reduction was not error.
 
 
 29
 Much the same holds true for Barajas' case. Just as Zaragoza persisted in denying his role in the offense, so too did Barajas. Most notable in this regard was Barajas' continued denial that she supplied the scheme with names and personal information for phony claimants by misappropriating files containing such information from Nationwide Acceptance Corp., where she worked in a managerial capacity. By Barajas' account, the names and information were supplied either by her niece, who worked part-time at Nationwide for a short time, or her brother Jose, who copied the information from files that Barajas brought home while living in Jose's apartment. As to Barajas' first theory, the evidence reveals that claims were submitted to IDES on behalf of purported claimants whose names were obtained through Nationwide well before Barajas' niece began employment there. As to her second theory, the district court concluded that it was "basically absurd," and so do we. The evidence is clear that Barajas willingly participated in this scheme by, among other things, forging documents and appearing at IDES offices pretending to be a claimant. To suggest that her co-schemers had to resort to stealing names from her files while she was willingly participating in other aspects of the scheme is just inane, and the district court sensibly rejected this preposterous contention. As with Zaragoza, Barajas' denial of her complete role in this scheme is a wholly adequate ground for denying her an acceptance of responsibility reduction.
 
 INDIVIDUAL ISSUES
 Barajas' Abuse of a Position of Trust
 
 30
 Barajas contends that the district judge erred in imposing a two-level abuse-of-trust enhancement for her conduct in misappropriating names and personal information from Nationwide Acceptance Corp.'s files for use in the scheme. Whether Barajas occupied a position of trust is a question of fact that we review for clear error. United States v. Boyle, 10 F.3d 485, 489 (7th Cir.1993). Further, the determination of whether a defendant occupied a position of trust must be made from the perspective of the victim. United States v. Hathcoat, 30 F.3d 913, 919 (7th Cir.1994). "[I]n determining the applicability of this Guideline, the court must determine '(1) whether the defendant occupies a position of trust; and (2) whether the defendant abused his position in a manner that significantly facilitated the commission or concealment of the offense.' " Boyle, 10 F.3d at 488-89 (quoting United States v. Gould, 983 F.2d 92, 94 (7th Cir.1993)). Barajas challenges the district court's determination that she deserved an abuse-of-trust enhancement on both of these scores.
 
 
 31
 Her first contention is that there was "no evidence that [she] held a position of trust relative to the people whose names and biographical information was used." To the extent that Barajas' argument is that there must be an individual or personal repose of trust by the victims in order to support an abuse-of-trust enhancement, we disagree. Barajas cites no authority, either in the form of case law or Guideline commentary, to support such a position and we find it untenable. Cf. United States v. Bhagavan, 116 F.3d 189 (7th Cir.1997) (majority shareholder who diverted corporate funds and evaded taxes on those funds abused position of trust vis-a-vis minority shareholders who do not personally repose trust--duty of trust arises solely as a matter of corporate law). Certainly those who turned over personal biographical and financial information to Nationwide Acceptance did so with the expectation that the information would be used only for purposes necessary for the processing of their loan applications and that the files would be handled in a manner that ensured their confidentiality.
 
 
 32
 Next, it is an entirely reasonable inference that Barajas' position as branch manager afforded her a unique opportunity to handle loan applicants' files--including taking those files home, which Barajas admitted to doing--without supervisory oversight. Presumably lower-level employees at Nationwide Acceptance acted under the watchful eyes of managers such as Barajas who ensured that loan applicants' confidential information was handled in such a manner as to maintain its confidentiality. Unhindered by the threat of such oversight, Barajas was able to remove files to her home with impunity. Abuse of this sort of managerial discretion fits readily within the abuse-of-position-of-trust enhancement. Cf. United States v. Tardiff, 969 F.2d 1283, 1289 (1st Cir.1992) (noting that a " 'primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong.' ") (quoting United States v. Hill, 915 F.2d 502, 506 (9th Cir.1990)). Thus we are unmoved by Barajas' contention that even low-level employees handling applicants' files at Nationwide had access to the same information as did she. The difference, afforded by her managerial position, lies in the fact that she had the unfettered ability to remove files without risk of detection. Accordingly, we conclude that Barajas occupied a position of trust.
 
 
 33
 Barajas' second contention--that her abuse of trust did not significantly facilitate the fraudulent scheme--merits only brief comment; indeed, even she concedes that the information she misappropriated was "necessary to setting the scheme in motion" and "essential" to the scheme. Barajas Br. at 16. Her argument on this score is simply that the misappropriation of names and personal information "did not significantly facilitate the crime as much as" completion of the various IDES forms and applications. It simply makes no difference that there were other acts that were essential to the scheme. The issue is only whether Barajas' misappropriation of names and personal information "significantly facilitated" the scheme and it cannot be doubted that it did. In order to succeed, this scheme needed names of purported claimants accompanied by accurate personal information corresponding to those names. Barajas supplied this indispensable information. Accordingly there was no error in the district court's conclusion that Barajas abused a position of trust warranting an enhancement under U.S.S.G. § 3B1.3.
 
 
 34
 Zaragoza's Aggravating Role as a Leader or Organizer
 
 
 35
 Zaragoza contends that a remand for resentencing is warranted in his case because the district court failed to support with specific findings its determination that he qualified for an aggravating-role enhancement under U.S.S.G. § 3B1.1(a). More precisely, Zaragoza complains that the district court did not specifically identify the five participants in the scheme or determine whether he had control over four other participants as this Court has required. See United States v. Schweihs, 971 F.2d 1302 (7th Cir.1992). Indeed, this Court has stated that prior to imposing an aggravating-role enhancement under U.S.S.G. § 3B1.1(a), the district judge "must identify five participants in [the] offense ... [and] determine whether [the defendant] exhibited leadership of or control over all of the five participants." Schweihs, 971 F.2d at 1318. In view of the frequency with which defendants appeal from enhancements under § 3B1.1, our admonition easily bears repeating.
 
 
 36
 While we require specific findings to support an enhancement under § 3B1.1, our decisions in this area also make clear that the district court's failure to make such findings need not result invariably in a remand. Rather, we will uphold the sentence so long as the enhancement is adequately supported by the record. See, e.g., United States v. Pippen, 115 F.3d 422 (7th Cir.1997) ("Although the judge's explanation of his finding was regrettably brief, we find that the record adequately supported his conclusion and thus that the judge did not clearly err in imposing the enhancement."); United States v. McKinney, 98 F.3d 974, 982 (7th Cir.1996) ("Even when the district court has failed to make specific findings with regard to a defendant's role as a leader or organizer, we have affirmed where 'the record adequately supports such a determination.' ") (quoting United States v. Carson, 9 F.3d 576, 585 (7th Cir.1993), certiorari denied, 513 U.S. 844, 115 S.Ct. 135, 130 L.Ed.2d 77), certiorari denied, --- U.S. ----, 117 S.Ct. 1119, 137 L.Ed.2d 319; United States v. Flores-Sandoval, 94 F.3d 346, 349 (7th Cir.1996) ("we may affirm Flores' sentence on any grounds found in the record, regardless of the rationale employed by the district court").
 
 
 37
 In the instant case, Judge Kocoras concluded that Zaragoza was "at the heart of this scheme." Continuing, he remarked:
 
 
 38
 And this also touches on his role in the offense. He is central to this scheme. He is the one who controlled the business--one of the businesses that was involved here--where these names supposedly appeared as employees. He is involved in the account. He is involved in the bank account. He is involved in the addresses. He is absolutely central to this scheme. And there is no way around it.
 
 
 39
 * * * I think Sergio was an acknowledged leader-at least acknowledged on my part--along with [Jose Zaragoza].
 
 
 40
 I think those two were the leaders of this scheme. But Sergio is right in it up to his eyeballs, and there is too much evidence. A lot of it circumstantial, but it all leads to the same things.
 
 
 41
 * * *
 
 
 42
 It is clear that this name [Louis Valera] ... has been used by more than one person, and perhaps even in connection with the scheme. But the significant thing about that is that the Louis Valera name that was used here for the operation of the scheme was used by Sergio [Zaragoza], because it all comes back to him. We have the accountant ... [and] the liquor license application. [ ][9] As they used to say in the old days, all roads lead to Rome here, and Sergio is basically along with Jose (Rome), at least by my calculation.
 
 
 43
 So not only is he a leader and organizer of a group which has at least five players--and who knows how many more but at least that many--but the loss is eminently foreseeable to him.
 
 
 44
 Transcript of Sept. 12, 1996 Proceedings at 31-32.
 
 
 45
 Although Judge Kocoras' findings are not specific in all aspects, the gist of his reasoning is readily apparent and, as we explain below, his conclusion that Zaragoza's role in the offense warrants an enhancement under § 3B1.1 (a) is not clearly erroneous. We pause to note that Zaragoza never specifically objected to the aggravating role enhancement on the basis that there were fewer than five participants in the scheme. Thus to the extent that this is one of the grounds for Zaragoza's appeal (he does not really press the issue, he simply contends that the district court failed to specifically identify five participants), we review the district court's finding only for plain error. There is none.
 
 
 46
 The record amply supports the district court's conclusion that there were at least five participants. In addition to Sergio Zaragoza (who, of course, is counted as a participant, see United States v. Gerstein, 104 F.3d 973, 979 (7th Cir.1997)) and his sister Alicia Zaragoza-Barajas (whose role in the scheme has been outlined above), the superseding indictment also names one John Doe, also known as Guadalupe Partida, as a co-schemer in the IDES fraud scheme. The record indicates that Partida was an employee at Douglas Furniture, where about sixty of the persons whose names were used as purported claimants in the scheme were also employed. Partida also opened an account at Chicago National Bank into which he second-endorsed and deposited many of the checks mailed to purported claimants. He also made withdrawals from the account.
 
 
 47
 Three other persons charged in the criminal complaint--Jose Zaragoza, Mayra Zaragoza (Jose's wife), and Cesar Zaragoza (Jose's nephew)--remain fugitives, but the record supports the conclusion that they too were participants in the scheme to defraud IDES. Jose's role in the scheme as the owner of La Palapa restaurant has been sufficiently outlined above. Mayra's involvement in the scheme included going to the IDES offices on two separate occasions, each time representing that she was a purported claimant (a different claimant on each occasion), in support of a claim for unemployment benefits. Cesar Zaragoza was observed by law enforcement agents picking up mail at locations used as addresses for purported claimants. He also second-endorsed IDES checks sent to purported claimants and deposited them into his account at Chicago National Bank. Thus the record plainly supports the conclusion that there were at least six participants in the scheme.
 
 
 48
 Turning to Zaragoza's complaint that the district judge failed to make specific findings that Zaragoza exercised control over the other participants, we begin by noting that this articulation of Zaragoza's contention is rather different from the objection he raised to the enhancement before the district court. In the "Position Paper and Commentary on Sentencing Factors" (Docket # 91) that Zaragoza submitted to the district court prior to the sentencing hearing, Zaragoza's specific argument was simply that he was not the real Louis Valera who "operated El Saloon and directed the fraudulent activity in this case." Id. at 5. Implicit in this argument is the concession that Louis Valera, whoever he is, "directed the fraudulent activity in this case." As the excerpt quoted above reveals, Judge Kocoras concluded that, at least for purposes of directing this scheme, "Louis Valera" was none other than Sergio Zaragoza. This conclusion was not clearly erroneous. As Judge Kocoras alluded to, several pieces of evidence converged to establish that Zaragoza was the Louis Valera who was directing the scheme to defraud the IDES. The record reflects that Louis A. Valera is identified in City of Chicago records as the owner of El Saloon bar. Zaragoza's fingerprints match those taken prior to the issuance of a liquor license to El Saloon and held on file by the City as belonging to Louis A. Valera, the owner of El Saloon. In a related vein, the mail for El Saloon was ordered forwarded to a post office box and the change of address form was signed by Louis A. Valera. At the time of his arrest, a key to the post office box was found on Zaragoza's person. Also, since his arrest, El Saloon has not reopened and the mail at the post office box has not been claimed. As Judge Kocoras specifically alluded to, the accountant for El Saloon, Rosario Ortiz, prepared the IDES forms for a person she knew as Louis A. Valera and identified a photograph of Zaragoza as that person. Furthermore, Ms. Ortiz stated that she has seen Zaragoza sign his name "Louis Valera" and she positively identified the Louis A. Valera signature that appears on a number of El Saloon documents as his. Adding further corroboration, four UC3/40 forms submitted to IDES in 1994 bore Zaragoza's fingerprints. There is more evidence linking Zaragoza to the identity of Louis A. Valera--e.g., Zaragoza maintained several bank accounts in the name of Louis A. Valera into which IDES checks were deposited and each of these accounts had signature cards bearing the name Louis A. Valera but the fingerprints of Sergio Zaragoza--but we need not recount it all. Based on the foregoing evidence alone, it is plain that the district court did not clearly err in concluding that Zaragoza was the Louis A. Valera at the center of this scheme.
 
 
 49
 Having determined that Zaragoza was indeed the Louis A. Valera who devised and was at the center of the scheme to defraud IDES, we can find no error in the corollary inference that Zaragoza exercised control, either direct or indirect, over the other participants in the scheme, whose roles involved supplying names of purported claimants (Barajas), assuming the identities of claimants when necessary for IDES interviews (Barajas, Mayra Zaragoza), and second-endorsing checks and depositing them into accounts controlled by the co-schemers (Partida, Cesar Zaragoza). As noted above, Zaragoza effectively conceded the fact that Louis A. Valera "directed" the scheme; and it is a sound inference that these other players would not have engaged in their scheme-related conduct absent Zaragoza's (a/k/a Louis A. Valera) orchestrations. See United States v. Carson, 9 F.3d 576, 585 (7th Cir.1993), certiorari denied, 513 U.S. 844, 115 S.Ct. 135, 130 L.Ed.2d 77. For the foregoing reasons, the district court did not err in imposing the aggravating role enhancement under § 3B1.1(a).
 
 GOVERNMENT'S CROSS-APPEAL
 
 50
 The government cross-appeals Zaragoza's sentence, contending that the district court was obligated to impose an enhancement for obstruction of justice in view of its determination that Zaragoza attempted to falsify his handwriting exemplars. We agree.
 
 
 51
 Section 3C1.1 of the Sentencing Guidelines provides for a two-level sentencing enhancement for a defendant's willful obstruction of justice:
 
 
 52
 If the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the investigation, prosecution or sentencing of the instant offense, increase the offense level by 2 levels.
 
 
 53
 U.S.S.G. § 3C1.1. To justify a sentencing enhancement for obstruction of justice, the government need only prove the obstruction by a preponderance of the evidence. United States v. Hickok, 77 F.3d 992, 1006 (7th Cir.1996), certiorari denied, --- U.S. ----, 116 S.Ct. 1701, 134 L.Ed.2d 800; United States v. Osborne, 931 F.2d 1139, 1153 (7th Cir.1991).
 
 
 54
 Although this Court has never had occasion to rule specifically on the issue, as the plain language of the Guideline reflects, the obstruction enhancement is mandated where the defendant has engaged in qualifying conduct. This is, of course, a rather unremarkable conclusion and is simply a specific application of this Court's general observation that "[u]nlike a Guidelines departure, enhancement based on relevant conduct is mandatory, not discretionary." United States v. Thomas, 969 F.2d 352, 356 (7th Cir.1992), certiorari denied, 506 U.S. 896, 113 S.Ct. 274, 121 L.Ed.2d 202.
 
 
 55
 Recently the Supreme Court noted in dicta that "[u]pon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines." United States v. Dunnigan, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445. Every circuit that has addressed the issue of whether the obstruction enhancement is mandatory once the sentencing court has determined that the factual predicates for the enhancement have been met has held that it is. See, e.g., United States v. Friedman, 998 F.2d 53, 58 (2d Cir.1993) ("The obstruction of justice enhancement ... is mandatory once its factual predicates have been established."); Hall v. United States, 46 F.3d 855, 858-859 (8th Cir.1995) ("If Hall threatened the witness, the district court had no choice but to impose the sentence enhancement that the Guidelines mandate."); United States v. Ancheta, 38 F.3d 1114, 1117 (9th Cir.1994) ("The applicable guideline for obstruction of justice, section 3C1.1, declares: 'If the defendant willfully obstructed or impeded ... the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by two levels.' U.S.S.G. § 3Cl.1. This language is mandatory, not discretionary."); United States v. Velgar-Vivero, 8 F.3d 236, 242 (5th Cir.1994) ("The increase is not discretionary. If the court finds the defendant obstructed justice, it must impose the two point increase."), certiorari denied, 511 U.S. 1096, 114 S.Ct. 1865, 128 L.Ed.2d 486; United States v. Medina, 992 F.2d 573, 591 (6th Cir.1993) (stating in the context of obstruction of justice enhancement, "as we have explained previously, [o]nce a sentencing court makes a factual finding as to the applicability of a particular adjustment provision, the court has no discretion, but must increase the offense level by the amount called for in the applicable provision") (internal quotation marks and citation omitted), certiorari denied, 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 371; United States v. Ashers, 968 F.2d 411, 414 (4th Cir.1992) (noting, in the context of obstruction of justice enhancement, that "application of an enhancement to the offense level is mandatory, as opposed to discretionary, in the event the defendant engaged in conduct that is encompassed by a guideline providing for an enhancement"), certiorari denied, 506 U.S. 1027, 113 S.Ct. 673, 121 L.Ed.2d 596; United States v. Austin, 948 F.2d 783, 788 (1st Cir.1991) ("Once the district court found that the Appellant's testimony was intentionally untrue and constituted perjury, the court was mandated by Federal Sentencing Guidelines to impose the § 3C1.1 two level enhancement."). There is no basis for departing from this sound consensus, and we now expressly hold that once the government has proved by a preponderance of the evidence that a defendant has willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice, the sentencing court has no discretion but to impose the two-level enhancement provided for by § 3C1.1.
 
 
 56
 In light of the foregoing, it is apparent that the district court erred in not imposing an obstruction enhancement in this case. In ruling on the obstruction enhancement Judge Kocoras stated:
 
 
 57
 [T]he obstruction of justice calculation, that is a little bit tougher for me to deal with. Is it more probable that he was disguising his handwriting than not? I think conscience might require me to say yes to that. Is it overwhelming? No.
 
 
 58
 Is it appropriate to put the enhancement on the strength of this one activity, especially in light of what I intend to do on the acceptance thing? I do not know.
 
 
 59
 * * *
 
 
 60
 [M]aybe I am not discharging my duties properly by saying this--but in some ways I feel hamstrung by the guidelines, especially on this obstruction thing.
 
 
 61
 Do you want me to be honest with you and tell you did the government make a case on obstruction? I think so. Not significantly. 51/49? Maybe. But is it fair, in light of where the calculation takes us and in light of the fact that I am not going to give him a reduction for acceptance of responsibility? I am not so sure justice is going to be severely offended if I do not hit him with the obstruction enhancement. So that is why I am not going to do it.
 
 
 62
 Sentencing Transcript at 33-34.
 
 
 63
 Judge Kocoras' remarks make clear that he found the government to have proved obstruction by a preponderance of the evidence. Nevertheless, in light of his decision to deny Zaragoza an acceptance of responsibility reduction, he declined to impose the obstruction enhancement in order to avoid what he considered to be an excessive sentence. The clear mandate of the Guidelines precludes such an exercise of discretion. Accordingly, Zaragoza's sentence must be vacated and his case remanded to the district court for resentencing.
 
 
 64
 For the foregoing reasons, the order of the district court sentencing Alicia Zaragoza-Barajas is affirmed. The district court's order sentencing Sergio Zaragoza is affirmed in part and vacated in part. Zaragoza's case is remanded for resentencing consistent with this opinion.
 
 
 
 [1]
 Ownership of El Saloon was actually held in the name of Louis A. Valera. The district court found that Sergio Zaragoza and Louis A. Valera were one and the same. In the course of its investigation, the government took handwriting exemplars from Zaragoza to determine if it was he who had signed many of the relevant documents in this case under the alias Louis A. Valera. Both the case agent who took the exemplars and watched Zaragoza write, and the government's expert who independently analyzed the exemplars, concluded that Zaragoza consciously attempted to disguise his handwriting by writing unnaturally
 
 
 [2]
 Six other names used in the scheme were traced to another business where Barajas had previously worked
 
 
 [3]
 All claimants identifying Landscape Maintenance as their employer had listed as their address that of El Saloon
 
 
 [4]
 Section 3664(a) provides: "The court, in determining whether to order restitution under section 3663 of this title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate."
 
 
 [5]
 In their briefs, defendants both refer to the district judge's failure to discuss all of the factors set out at 18 U.S.C. § 3664. Although more detailed findings than the district judge offered here would certainly be preferable, this Court has noted repeatedly that § 3664 does not require express findings as to each and every factor. See, e.g., United States v. Jaroszenko, 92 F.3d 486, 492 (7th Cir.1996) ("When announcing the order, the court need not make formal findings or explain its consideration of these factors."); United States v. Ahmad, 2 F.3d 245, 246 (7th Cir.1993) ("A few courts of appeals require express findings.... We do not.") (citations omitted); United States v. Helton, 975 F.2d 430, 432 (7th Cir.1992); United States v. Arvanitis, 902 F.2d 489, 495-496 & n. 6 (7th Cir.1990); United States v. Mahoney, 859 F.2d 47, 50 (7th Cir.1988)
 
 
 [6]
 As "evidence" of their inability to pay restitution, defendants note that the district judge failed to impose a fine and assert that the district judge "waived the fine based on the [appellants'] inability to pay yet ordered [them] to pay restitution in the amount of $569,741.00 without any explanation." Zaragoza Br. at 8. Contrary to the defendants' assertion, we can find no basis for concluding that Judge Kocoras "waived the fine based on the [appellants'] inability to pay." His only remarks in this regard are "I will not recommend a fine in light of the restitution amount" and "There will be no fine, but there will be restitution in the full amount of $569,741." Sentencing Transcript at 65, 67. Thus there is no facial inconsistency--vis-a-vis ability to pay--in the district court's failure to impose a fine while ordering restitution. Accordingly, defendants' citation to United States v. Berman, 21 F.3d 753, 758-759 (7th Cir.1994), and United States v. Korando, 29 F.3d 1114, 1120 (7th Cir.1994), certiorari denied, 513 U.S. 993, 115 S.Ct. 496, 130 L.Ed.2d 406, is inapt because in both of those cases vacation of the restitution order resulted from the anomaly that the district court found the defendant(s) unable to pay a fine while capable of paying restitution. See also United States v. Ahmad, 2 F.3d 245, 247-248 (7th Cir.1993)
 
 
 [7]
 In addition to the two-level reduction under subsection (a), Zaragoza maintains that he is entitled to an additional one-level reduction under subsection (b)(2) for "timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." U.S.S.G. § 3E1.1(b)(2). A defendant may receive the additional one-point reduction only if he or she qualifies for the two-level acceptance of responsibility reduction under subsection (a). Because we conclude that Zaragoza was not entitled to the subsection (a) reduction, we need not consider whether he was entitled to the additional reduction under subsection (b)(2)
 
 
 [8]
 Notably, Zaragoza's denial that he was Louis Valera forced the government to obtain handwriting exemplars from him. The government's evidence indicates, and the district court concluded, that Zaragoza attempted to falsify his exemplars by writing in an unnatural manner. As is discussed later in this opinion, Zaragoza's attempt to falsify his handwriting exemplars warrants an enhancement for obstruction of justice. The Guidelines caution that where a defendant qualifies for an obstruction enhancement, a reduction for acceptance of responsibility would be appropriate only in an "extraordinary" case. This case is not at all extraordinary
 
 
 [9]
 [This Court's footnote] The references here are to (1) evidence contained in the presentence investigation report that the fraudulent UC3/40s submitted to IDES were prepared by accountant Rosario Ortiz from information provided to her by her client, Louis Valera, the owner of the bar. Ortiz identified a photograph of Sergio Zaragoza as the man she knows as Louis Valera; and (2) the fact that the City of Chicago issued a liquor license to the owner of El Saloon bar, Louis Valera, whose fingerprints were kept on file. Those fingerprints matched those of Sergio Zaragoza